**Alan B. WEISSMAN and Vivien K. Weissman, Plaintiffs,**

v.

**Irwin FRUCHTMAN, Robert Esnard, Irving E. Minkin, Herbert Sturz, Cornelius F. Dennis, Ronald Silvers, Maurice Beane, Joseph Aguirre, George C. Sakona, Jerome De Canio, Betsy Haggerty, Judith Spektor, William Valletta, Jeffrey Glen, Leo Weinberger, Louis Munoz, Melvin Sokal and The City of New York, Defendants.**

No. 83 Civ. 8958(PKL).

United States District Court, S.D. New York.

Nov. 29, 1988.

Liebman, Adolf & Charme, New York City, for plaintiffs; Stephen M. Charme, of counsel.

Peter L. Zimroth, Corp. Counsel, New York City, for defendants; Gabriel Taussig, Robin Binder, Jane L. Gordon, of counsel.

## OPINION AND ORDER

LEISURE, District Judge:

The present action is the latest sally in a protracted legal battle between plaintiffs and various officials of the City of New York as well as the City itself, arising from the defendants' regulatory actions regarding plaintiffs' former property. Although the convoluted history of this lengthy dispute does not easily lend itself to recapitulation, the essential facts are as follows.

From December 1980 until January 6, 1986, plaintiffs were the owners of the land and buildings located at 400–406 West 57th Street, New York, New York.[1] The buildings on this property contained housing units, and were not separated by open space or zoning lot lines. On August 22, 1980, plaintiffs submitted an application to the New York City Department of Buildings ("DOB") for an alteration permit to perform alterations at 400–404 West 57th Street ("400–404"). On November 4, 1981, plaintiffs submitted an amendment to this application seeking permission to perform alterations at 406 West 57th Street ("406") and to combine 406 with 400–404, creating a single building. The DOB approved the application and issued the alteration permit on December 23, 1981.

Plaintiffs then engaged a contractor, who gutted the interior of all unoccupied units in 406 in preparation to performing the authorized alterations. After the con-

---

1. There is some dispute as to whether the structures, separated from each other by party walls, constituted one, two or three buildings. For convenience, the Court will refer to 400 and 404, which were issued a single certificate of occupancy, as one building, and to 406, which received a separate certificate of occupancy, as a separate building. In any event, this issue is not material to the constitutional claims presented in these motions.

clusion of this work, plaintiffs were informed by their architect and their engineer that the building suffered from numerous serious structural defects. Acting upon this information, plaintiffs notified defendant Irwin Fruchtman, then Commissioner of the DOB, that the construction personnel hired by plaintiffs believed a life-threatening situation to exist at 406. Plaintiffs expressed the opinion that 406 was unsafe and should be vacated immediately because it was in imminent danger of collapse. They also requested that the DOB conduct its own inspection and order that the building be vacated so that it might be demolished.

In response to plaintiffs' request, employees of the DOB conducted an inspection of 406 on April 22, 1982. Substantial structural violations of the Building Code of the City of New York were discovered, and three Notices of Violation were issued to plaintiffs. These Notices required plaintiffs to perform extensive shoring and to make permanent repairs on 406 after obtaining any permits necessary for the remedial work.

Meanwhile, on or about April 30, 1982, plaintiffs were notified by a letter from defendant George Sakona, Manhattan Borough Superintendent of the DOB, that their alteration permit had been revoked for noncompliance with § 96–109 of the Zoning Resolution—specifically, for failure to obtain a certificate from the New York City

Department of Housing and Urban Development ("HUD") stating that no harassment of tenants had occurred on the subject premises ("certificate of no harassment").[2] Plaintiffs had not been provided with notice or an opportunity to be heard prior to the DOB's determination to revoke the permit.

Plaintiffs did not apply for a certificate of no harassment upon discovering that the basis for the revocation of their permit was their failure to obtain such a certificate. Nor did they appeal the DOB's decision. The City Charter allows a permittee to appeal the revocation of an alteration permit to the New York City Board of Standards and Appeals ("BSA"), an administrative agency authorized to hear such appeals. See New York City Charter, §§ 666(7)(a), (formerly § 666(6)(a)), and 669(a). At the time plaintiffs' permit was revoked, the Charter further provided that an appeal to the BSA would "stay all proceedings in furtherance of the action appealed from, unless the officer from whom the appeal [was] taken" filed a certificate with the BSA stating that a stay would "in his opinion cause imminent peril to life or property." New York City Charter, former § 669(c).

On June 18, 1982, defendants Ronald Silvers and Joseph Aguirre, DOB employees, conducted another inspection of 406. Aguirre issued a report stating that 406 did, in fact, require structural repair, but

---

**2.** At the time of plaintiffs' application, § 96–109 required that, prior to the issuance of a permit for an alteration other than an incidental alteration of any residential building in the Preservation Area of the Special Clinton District ("Clinton District" or "District"), the HUD "certify to the Department of Buildings ... [t]hat the eviction and relocation practices followed by the owner of the building satisfy all applicable legal requirements and that no harassment has occurred." 25 feet, or 20%, of plaintiffs' property was located within the Clinton District.

A few months prior to applying for their alteration permit, plaintiffs had been found guilty of criminal contempt for harassing tenants in violation of a court order (Order, Civil Court, New York, Housing Part 49–D, September 21, 1981, George, H.J.). (This order was later modified by the Appellate Term, First Department on May 24, 1983, to the extent of striking the paragraph finding the owner to be in contempt). In

addition, a letter dated July 28, 1981, and signed by several tenants of 400 West 57th Street, had been sent to defendant Herbert Sturz, Director of the Department of City Planning, alleging various instances of tenant harassment.

Sturz indicated in a letter to the tenants dated August 12, 1981, that, in his opinion, the property was not subject to § 96–109 because less than 50% of the premises was located within the District. In his letter, Sturz cited § 77–11 of the Zoning Resolution, which provides that a zoning lot is generally subject to the regulations governing the district in which more than 50% of the lot is located. Sturz subsequently changed this opinion, however, in a letter to the New York City Conciliation and Appeals Board, dated October 29, 1981. In that letter, he noted that § 77–11 does not apply where special provisions are made for a special purpose district, and judged that § 96–109 was such a special provision.

that the damage was not so severe as to justify plaintiffs' request to vacate and demolish the building. The report did, however, find that some tenants should be temporarily relocated within the building while repairs were being undertaken. A further inspection was conducted by defendants Jerome DeCanio, Deputy Borough Superintendent of Manhattan Borough, and Maurice Beane, a DOB inspector, on June 25, 1982. They similarly concluded that, although the building was in need of immediate repair, a vacate order was not warranted at that time.

In June of 1982, plaintiffs commenced the first of numerous legal actions concerning the subject premises in the New York State Supreme Court, entitled *Weissman v. City of New York*, Index No. 14180/82 (Sup.Ct., N.Y. Co.), *rev'd*, 96 A.D.2d 454, 464 N.Y.S.2d 764 (1st Dep't 1983), *app. dism.*, 60 N.Y.2d 815, 469 N.Y.S.2d 700, 457 N.E.2d 807 (1983) (*"Weissman I"*). Plaintiffs petitioned the court: i) to compel the DOB to issue an order vacating 406 and staying enforcement of the Notices of Violation that had been served on plaintiffs and ii) to set aside as improper the DOB's revocation of plaintiffs' alteration permit. The Supreme Court, although finding that the DOB's refusal to issue an order to vacate was not arbitrary and capricious in light of the standards applicable to such orders,[3] nonetheless held that a temporary vacate order was required to accomplish the necessary repairs. The court also held that the permit revocation had been improper, and ordered that a new permit be issued.

The Appellate Division, First Department, reversed this determination on appeal, on the grounds that, since plaintiffs had failed to exhaust their administrative remedies by appealing the revocation to the BSA, the state court lacked jurisdiction over plaintiffs' claims. *See* 96 A.D.2d 454, 456–457, 464 N.Y.S.2d 764, 767. An appeal of this ruling to the New York Court of Appeals was dismissed as untimely under N.Y.Civ.Prac.L. & R. § 5513 (McKinney 1978). *See* 60 N.Y.2d 815, 469 N.Y.S.2d 700, 457 N.E.2d 807 (1983). Plaintiffs then finally sought to appeal the permit revocation to the BSA, but the BSA denied plaintiffs leave to file an appeal application on the grounds of untimeliness. This denial was subsequently upheld in *Weissman v. City of New York*, Index No. 92071/83, (Sup.Ct., N.Y.Co.1984).[4]

On March 18 and 23, 1983, defendant DeCanio, accompanied by two other DOB employees, conducted new inspections of all of the subject properties. In a report dated March 25, 1983, DeCanio cited numerous structural defects in each of the subject buildings. DeCanio expressed the opinion that although immediate shoring of the structures was necessary, a vacate order was not justified at that time. The DOB issued an order requiring plaintiffs to perform the necessary shoring on March 25, 1983.

Subsequently, plaintiffs initiated another proceeding in the State Supreme Court, *Weissman v. City of New York*, Index No. 08019/83 ("Weissman II"). Plaintiffs sought a court order: i) staying enforcement of the DOB's order to shore the subject premises; and ii) directing the DOB to issue an order to vacate the buildings.

Seven days after *Weissman II* was filed, a team of DOB officials, accompanied by defendant DeCanio, conducted a further inspection of the buildings. In a report dated April 8, 1983, the employees determined that a vacate order should be issued for

---

3. § 26–243(c) of the Administrative Code of the City of New York authorizes the DOB to issue a vacate order where:

> in the opinion of the superintendent, there shall be actual and immediate danger that any structure or part thereof will fall so as to endanger life or property, or where any structure or part thereof has fallen and life is endangered by the occupation thereof ...

4. Plaintiffs make much of the fact that this decision left them with a DOB order demanding that they effect substantial repairs but no valid alteration permit allowing them to make such repairs. Whether plaintiffs would in fact have been unable to perform the repairs ordered by the DOB without an alteration permit is a matter of dispute between the parties. However, nothing in the state court's decision precluded plaintiffs from reapplying for the necessary permits.

406. Defendant DeCanio, who only two weeks earlier had reported that an order to vacate was not warranted, expressed no opposition to this determination. Affidavit of Jerome Decanio [submitted in *Weissman II*], sworn to on April 12, 1983, attached as Exhibit 17 to Affidavit of George Sakona, sworn to on June 12, 1988. On April 14, 1983, the order to vacate was issued by the DOB. In a separate report, the DOB maintained that a vacate order was not required for 400–404.

Plaintiffs instituted the present action in this Court in December 1983, seeking monetary and injunctive relief pursuant to 42 U.S.C. § 1983, challenging the constitutionality of the foregoing administrative actions by the DOB.

Thereafter, in January 1984, plaintiffs applied for a demolition permit which would authorize them to demolish 406. This application was denied by DOB on the grounds that 406 contained housing units and plaintiffs had failed to comply with applicable rent regulations. The denial of the demolition permit was subsequently upheld by the New York Supreme Court in *Weissman v. City of New York*, Index No. 16976/84 (Sup.Ct., N.Y.Co.1985) ("*Weissman III*"). Further inspections of 406 were undertaken on January 25 and February 22, 1984. DOB inspectors reported that a demolition order was not justified. Finally, apparently despairing of ever obtaining the DOB approvals necessary to develop their property as they wished, plaintiffs sold the subject premises for $4.1 million on January 6, 1986.

The complaint currently before the Court, plaintiffs' third amended complaint, essentially presents the following constitutional claims.[5] With regard to the revocation of the alteration permit, plaintiffs allege three constitutional violations: i) the revocation violated plaintiffs' substantive due process rights because it was based on non-compliance with § 96–109, a regulation which plaintiffs contend is unconstitutional; ii) the revocation based upon non-compliance with an unconstitutional statute subjected plaintiffs to an unconstitutional "taking" of property; and, iii) the revocation of their permit without prior notice or an opportunity to be heard violated their procedural due process rights.

With regard to the City's refusal to order that the buildings be demolished or vacated, plaintiffs argue that: i) the decisions by the various DOB officials and employees were arbitrary and capricious, violating plaintiffs' rights to substantive due process; ii) defendants' refusal to vacate and demolish plaintiffs' buildings, together with their orders that plaintiffs make repairs costing millions of dollars, subjected plaintiffs to an unconstitutional "taking" of property; and, iii) defendants' actions denied plaintiffs equal protection of the law, since the DOB has vacated and demolished other buildings similarly situated, whose structural defects were less dangerous than those of plaintiffs' properties.[6]

Both sides are in agreement as to the essential facts of the claims relating to the revocation of plaintiffs' alteration permit. Plaintiffs have moved for summary judgment under Fed.R.Civ.P. 56 as to liability

---

**5.** With respect to these claims, plaintiffs allege that the defendants, in league with other City officials, established an unconstitutional official policy known as the "tenant protection plan" to protect single room occupancy tenants. The purpose of this plan, plaintiffs allege, was to prevent plaintiffs and other New York City property owners "from lawfully using or developing their property in any manner that would interfere with the possession of tenants or reduce the availability of such housing." Plaintiffs' Third Amended Complaint, at ¶¶ 17, 18.

**6.** The present action in this Court was originally before Judge Brieant. In an earlier ruling, Judge Brieant determined that plaintiffs' claims concerning the DOB's denial of their application

for a demolition *permit* were barred by *res judicata,* since these claims were considered and rejected by the New York Supreme Court in *Weissman III. Weissman v. Fruchtman,* memorandum and order, Index No. 83–8958, at 4 (S.D.N.Y. Oct. 31, 1985 (CLB)) ("Second Memorandum and Order of Judge Brieant"). This Court upheld this determination in *Weissman v. Fruchtman,* 658 F.Supp. 547 (S.D.N.Y.1987 (PKL)), denying plaintiffs' motion to reargue Judge Brieant's ruling. Consequently, plaintiffs' only remaining claims concerning the vacation and demolition of their property relate to the DOB's failure to *order* that the premises be vacated and demolished.

on these claims, and defendants have cross-moved for summary judgment. Defendants additionally seek summary judgment on plaintiffs' claims regarding the DOB's failure to vacate and demolish plaintiffs' property. Based on the findings of fact and conclusions of law included herein, pursuant to Fed.R.Civ.P. 52(a), the Court grants defendants' motion for summary judgment as to plaintiffs' permit revocation claims, but denies the motion as to plaintiffs' claims concerning the DOB's failure to issue vacate and demolition orders.

## I. DOB'S REVOCATION OF THE ALTERATION PERMIT

### A. SUBSTANTIVE DUE PROCESS

Plaintiffs contend that revocation of their alteration permit for failure to comply with § 96–109 of the New York City Zoning Resolution violated their rights to substantive due process.[7] Section 96–109 provides that an alteration permit cannot be issued to the owner of residential property in the Clinton District unless the City's Department of Housing Preservation and Development issues a "certificate of no harassment" to the DOB.[8] Plaintiffs urge this Court to adopt the reasoning of Judge Broderick in *Baco Development Fifty-Fourth Street, Inc. v. City of New York*, (S.D.N.Y., 86 Civ. 2440 (VLB)). Judge Broderick found that § 96–109 represented an "undue interference with the use of plaintiff's land" because it acted to forever bar property owners from obtaining alteration permits if tenant harassment had ever occurred during the history of that property, regardless of how long ago such harass-

ment had occurred. Finding that the statute was not rationally related to the state's interest in preventing harassment of tenants, Judge Broderick declared the law unconstitutional on its face.

## STANDING

Before proceeding to a consideration of the merits of plaintiffs' procedural due process claim, the Court must determine whether that claim is properly before it. Article III, § 2 of the United States Constitution confines the federal courts to adjudicating actual "cases" and "controversies." In interpreting that restriction, federal courts have developed the doctrines of standing, ripeness, mootness, political question and the like. *See Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

Of the doctrines developed under the "case" or "controversy" requirement, perhaps the most important is standing, the question of whether the litigant is entitled to have the court determine the merits of his or her dispute. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Defendants assert that plaintiffs lack standing to assert a substantive due process challenge to § 96–109.

The application of the standing requirement is not susceptible to precise definition; rather, it depends upon the court's individualized determination as to the propriety of adjudicating the particular claim in the case before it:

> Typically, ... the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is enti-

---

**7.** In an earlier ruling in this case, Judge Brieant determined that an alteration permit is a property interest under New York law meriting constitutional protection. *See Weissman v. Fruchtman*, memorandum and order, Index No. 83–8958, at 13 (S.D.N.Y. June 24, 1985 (CLB)) ("First Memorandum and Order of Judge Brieant"). Defendants do not contest this determination.

**8.** At the time of plaintiffs' permit application, § 96–109 stated:

Prior to the issuance of an alteration permit by the Department of Buildings for an alteration other than an incidental alteration for a *building* containing *residential uses* within the

Preservation Area, the Administrator of Housing and Development shall certify to the Department of Buildings:

a) That prior to evicting or otherwise terminating the occupancy of any tenant preparatory to any alteration, the owner shall have notified the Administrator of Housing and Development of his intention to alter the *building;*

b) That the eviction and relocation practices followed by the owner of the *building* satisfy all applicable legal requirements and that no harassment has occurred. (emphasis in original)

tled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? *Is the line of causation between the illegal conduct and injury too attenuated?* Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?

*Id.* at 752, 104 S.Ct. at 3325 (emphasis added).

As the above highlighted sentence implies, plaintiffs' injury must normally be caused by the unconstitutional application of the statute to him or her, or the plaintiff will not have standing to attack the statute's constitutionality. As the Supreme Court stated in *U.S. v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960):

> one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.

*Id.* at 21, 80 S.Ct. at 522.

### 1. The Facial Challenge

■ Plaintiffs do not allege that § 96–109 was unconstitutional as applied to them. Nevertheless, they maintain that they may challenge the constitutionality of § 96–109 because their claim attacks the statute "on its face," and facial challenges are exempt from the normal standing requirement announced in *Raines*. *See, e.g., New York v. Ferber*, 458 U.S. 747, 769, 102 S.Ct. 3348, 3361, 73 L.Ed.2d 1113 (1982).

Plaintiffs, however, are incorrect in presuming that they may attack § 96–109 on its face. In *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Supreme Court stated that

> [t]here are two quite different ways in which a statute or ordinance may be considered invalid "on its face"—either because it is unconstitutional in every conceivable application, or because it seeks to prohibit such a broad range of protect-

ed conduct that it is unconstitutionally "overbroad."

*Id.* at 796, 104 S.Ct. at 2124.

In the first situation, "a holding of facial invalidity expresses the conclusion that the statute could never be applied in a valid manner." *Id.* at 797–798, 104 S.Ct. at 2124–2125. Such holdings, while they invalidate entire statutes, do not involve any departure from the general rule "that a litigant only has standing to vindicate his own constitutional rights" and "that constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court." *Id.* at 796, 798, 104 S.Ct. at 2124, 2125. Section 96–109 does not fit into this category. As noted above, plaintiffs do not maintain that § 96–109 could not be constitutionally applied to them. "It is well established that the courts will not invalidate a statute on its face simply because it *may* be applied unconstitutionally, but only if it *cannot* be applied consistently with the Constitution." *Robinson v. State of New Jersey*, 806 F.2d 442, 446 (3d Cir.1986) (emphasis in original).

The other context in which a facial challenge may be permitted is where the statute "seeks to prohibit such a broad range of protected conduct that it is unconstitutionally 'overbroad.'" *Vincent*, 466 U.S. at 796, 104 S.Ct. at 2124. However, the overbreadth doctrine is an exception carved out for cases involving First Amendment rights. *See United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) ("we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.").

It is the specially protected status of free expression in our Constitutional system which engendered the overbreadth doctrine. "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Secretary of State of Maryland v. J.H. Munson Co. Inc.*, 467 U.S. 947, 958, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984). The funda-

mental difference between a challenge to a statute regulating expression or other protected conduct and the regulation at issue in this case is clear. In First Amendment cases the court is concerned with the statute "on its face" because the overbreadth of the statute might in itself deter constitutionally protected and socially desirable conduct. *United States v. National Dairy Corp.*, 372 U.S. 29, 36, 83 S.Ct. 594, 599, 9 L.Ed.2d 561 (1963). No such factor is present here. Section 96–109 is directed at harassment of tenants, activity neither constitutionally protected nor socially desirable. "Chilling" of such harassment is not the type of unconstitutional legislative impact which this Court has a duty to guard against.

Nor would allowing the present plaintiffs to assert a facial attack to § 96–109 further the policy which has prompted courts to permit this unusual type of challenge. Consistent with the view that facial challenges are allowed primarily for the benefit of society, rather than for the benefit of the litigant, a victory by the plaintiff in such cases normally results in an injunction or a declaratory judgment, which serves the broad societal purpose of striking an unconstitutional statute from the books. In their present complaint, however, plaintiffs merely request monetary damages pursuant to U.S.C. § 1983. They do not seek either injunctive or declaratory relief.[9]

In fact, this Court could not grant such relief in this case even had plaintiffs sought it. The meaning of § 96–109 has been substantially modified by recent amendments to § 96–110. "Thus the issue of the validity of the old regulation is moot, for [that question] has 'lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law.'" *Princeton University v. Schmid*, 455 U.S. 100, 103, 102 S.Ct. 867, 869, 70 L.Ed.2d 855 (1982), *quoting Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969) (per curiam). The status of plaintiffs' claim therefore suggests no reason why they should at this stage be allowed to assert the facial invalidity of § 96–109, a regulation which they do not argue was unconstitutional as it was specifically applied to them.

The Court finds that the plaintiffs cannot assert a facial challenge to § 96–109, and thus lack standing to attack the alleged unconstitutionality of the provision as applied to third parties. Plaintiffs only permissible challenge to the constitutionality of § 96–109, therefore, would be an "as applied challenge."

2. An "As Applied" Challenge

RIPENESS

■ As noted earlier, plaintiffs do not contend that § 96–109 is unconstitutional as applied to them. An "as applied" challenge would not, in any event, be ripe for adjudication. In *Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court found plaintiff's Fifth Amendment taking and Fourteenth Amendment substantive due process claims based upon the application of zoning regulations premature because plaintiffs never applied for a variance from the regulations. The Court first observed that "taking" claims are "not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," and then extended this holding to substantive due process claims based upon the application of zoning resolutions. 473 U.S. at 186, 200, 105 S.Ct. at 3116, 3123. As the Court pointed out, proper adjudication of such claims depends in large part

upon an analysis of the effect the [administrative body's] application of the zoning ordinance and subdivision regulations had on the value of respondent's property and investment-backed profit expectations. That effect cannot be measured until a final decision is made as to how the regulations will be applied to

---

**9.** In their first amended complaint, plaintiffs had sought injunctive relief as well as monetary damages. After selling their property in January, 1986, however, plaintiffs amended their complaint and dropped their plea for injunctive relief.

respondent's property. No such decision had been made at the time resondent filed its § 1983 action, because respondent failed to apply for variances from the regulations.

*Id.* at 200, 105 S.Ct. at 3123.

In the case *sub judice,* plaintiffs admittedly never sought a certificate of no harassment. They therefore cannot allege that the revocation of their permit constituted a final determination[10] of whether they could make alterations to their buildings, rendering their claim ripe for adjudication.[11] Nor can they claim that the provisions of § 96–109 were applied to them in an unconstitutional manner. Since plaintiffs never applied for a certificate of no harassment, the alleged unconstitutional defects in § 96–109 were never applied to plaintiffs' property.

Applying for a certificate of no harassment would have resulted in a conclusive determination as to whether plaintiffs could have obtained an alteration permit from the DOB. *Williamson,* 473 U.S. at 193, 105 S.Ct. at 3120. Plaintiffs, however, failed to take this action. Since they no longer own the property, this failure by plaintiffs to seek a certificate of no harassment during the period of their ownership forever forecloses their right to bring a challenge to the application of § 96–109.

■ Since plaintiffs cannot present a proper facial challenge to § 96–109, and neither present an "as applied" challenge nor can present such a challenge in a manner that is ripe for adjudication, the Court need not consider the constitutionality of the past regulatory scheme. Defendants' motion for summary judgment on the substantive due process challenge to the revocation of their alteration permit is therefore granted.

## B. THE "TAKING" CLAIM

■ Plaintiffs also assert that the defendants' revocation of their alteration permit, having been based upon a facially unconstitutional zoning resolution, effected an unconstitutional "taking" of their property.

For the reasons given in the preceding substantive due process section, however, this claim is not justiciable. Plaintiffs cannot mount a proper facial challenge to § 96–109. Nor can they base their "taking" claim on an "as applied" attack upon the regulation. *Williamson, supra,* which requires a plaintiff challenging the application of a zoning ordinance to first obtain a final administrative decision concerning that ordinance, involved *both* a substantive due process claim *and* a taking claim. The Court held that, under either claim, the action was premature until the government entity had made "a final decision ... as to how the regulations [would] be applied to [plaintiffs'] property." 473 U.S. at 200, 105 S.Ct. at 3123. Since plaintiffs never applied for a certificate of no harassment, they never obtained a final decision regarding their application permit, and their "taking" claim never matured. Defendants' motion for summary judgment on the "taking" claim with regard to the permit revocation is therefore granted.

---

**10.** By eventually selling their property, plaintiffs rendered the City's refusal to grant them an alteration permit "final" in a very practical sense. However, by selling their property without ever applying for a certificate of no harassment, plaintiffs cannot circumvent the requirement that they must obtain a conclusive determination from the HUD for their claim to be justiciable. To the contrary, such "finality," which precluded the HUD from ever applying § 96–109 to plaintiffs, forever forecloses plaintiffs' claim.

**11.** The Court acknowledges that some federal courts have recognized an exception to the requirement of a final decision where such an application or submission would be an "idle and futile act." *See, e.g., Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1454 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988); *American Savings and Loan Ass'n v. County of Marin,* 653 F.2d 364, 371 (9th Cir. 1981). However, the Supreme Court has indicated that at least one application must be submitted before the futility exception applies. *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 352–353 n. 8, 106 S.Ct. 2561, 2566 n. 8, 91 L.Ed.2d 285 (1986); *Kinzli, supra,* at 1454. Plaintiffs in this case never made any application for a certificate of no harassment, nor have they argued for application of the futility exception in this case.

## C. PROCEDURAL DUE PROCESS

Plaintiffs further contend that the DOB violated their rights to procedural due process by revoking their alteration permit without affording plaintiffs prior notice or an opportunity to be heard. Defendants counter that plaintiffs' claim is not ripe for adjudication, and that, in any event, the DOB procedures regarding the revocation of the alteration permit did not violate plaintiffs' procedural due process rights.[12]

### 1. Ripeness of the Claim

■ Once again, the Court must initially determine whether plaintiffs' constitutional claim is justiciable. As a threshold matter, defendants argue that plaintiffs' procedural due process claim is not ripe for adjudication. Defendants base their contention on the fact that plaintiffs could have submitted a timely appeal of the permit revocation to the BSA, but failed to do so. While conceding that there is no requirement that plaintiffs exhaust their administrative remedies before bringing a § 1983 action, *see Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), defendants correctly point out that the doctrines of exhaustion and ripeness are conceptually distinct. *Williamson*, 473 U.S. 172, 192, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126 (1985).

Citing *Unity Ventures v. Lake County*, 841 F.2d 770, 776 (7th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988), for the proposition that courts "will not evaluate the adequacy of the procedures available to ... plaintiffs before [plaintiffs] have availed themselves of these procedures," defendants argue that plaintiffs' claim is forever premature because they failed to pursue in timely fashion the administrative appeal procedures whose constitutionality they now attack. The Court finds merit in defendants'

ripeness challenge, but not for the reasons advanced by defendants.

Plaintiffs were not required to appeal administratively the revocation of their permit to render their procedural due process claim ripe. Such action, which admittedly would have been necessary had the exhaustion of remedies requirement applied to plaintiffs' claims, is not mandated by the ripeness doctrine. In *Williamson, supra,* the Supreme Court explained the difference between the two doctrines. The requirement that an administrative action be final before it is ripe demands that "the initial decisionmaker ... arrive[ ] at a definitive position on the issue that inflicts an actual, concrete injury." 473 U.S. at 193, 105 S.Ct. at 3120. In contrast, the exhaustion of remedies requirement, which does not apply to § 1983 actions, "refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.* at 193, 105 S.Ct. at 3120.

As these definitions suggest, an administrative decision may be a sufficiently final action to satisfy the finality requirement without representing an exhaustion of all available administrative remedies. In *Williamson*, which involved a challenge to zoning laws and regulations, the Court explained that the finality requirement of the ripeness doctrine would not require a plaintiff to appeal a planning commission's rejection of a plat proposal, although it would require him or her to request a variance from that commission. The Court distinguished the two situations by noting that the consideration of variance requests is part of a planning commission's *ongoing* decisionmaking process, while an appeal is

---

12. Plaintiffs argue that defendants' procedural due process arguments have already been rejected by Judge Brieant in his initial order denying defendants' motion for summary judgment on that issue. *See* First Memorandum and Order of Judge Brieant at 13–14. However, Judge Brieant himself limited the scope of this opinion in his second memorandum and order in this case, stating that he had decided only "that the City defendants have not established that the

availability of an Article 78 proceeding *standing alone* satisfied the Constitutional requirement of due process." Second Memorandum and Order of Judge Brieant, at 9 (emphasis added). Judge Brieant's opinion did not consider former § 669(c) of the New York City Charter, which, as discussed herein, would have entitled plaintiffs to a stay of the permit revocation had they appealed from that determination.

a review of the *final* determination of such a commission. A commission's refusal to allow a development of a plat without variances leaves open the possibility that the would-be developer may obtain commission approval merely by applying for variances and resubmitting the plat proposal once he or she obtains them. An appeal to another administrative body, on the other hand, would be a proceeding to determine whether the commission's final decision had violated the rights of the person appealing.

*Williamson* involved the ripeness of substantive due process and "taking" claims, and so is not directly apposite to the procedural due process claims discussed here. However, this distinction further supports this Court's finding that plaintiffs were not required to appeal the revocation of their permit. In substantive due process and "taking" claims, the essential injury is the *deprivation* of plaintiff's property. Thus, a variance request, or even an administrative appeal, is pertinent to such claims because it determines whether, in fact, the plaintiff will be deprived of his or her property.

▆▆▆ In procedural due process claims, on the other hand, the key factor is the *process* by which the plaintiff has been deprived of property. A plaintiff's procedural due process rights may be violated even if his or her property could, consistent with the constitution, ultimately have been taken from him or her. The important criterion in a procedural due process inquiry is not whether the state was justified in depriving the individual of his or her property, but rather whether the state obeyed the strictures of the constitution in bringing about that deprivation.

Defendants are therefore incorrect in asserting that plaintiffs needed to file a timely appeal of their permit revocation to the BSA for their procedural due process claim to be ripe. Such an appeal would have merely provided review of whether the *deprivation* of plaintiffs' property was proper. Since plaintiffs challenge the constitutionality of the *appeal procedures themselves*, which allowed permits to be revoked without affording their owners prior notice or

an opportunity to be heard, a BSA appeal would have had no effect on their procedural due process claim. No matter what the outcome of the appeal might have been, plaintiffs would still have been able to challenge the propriety of the revocation procedure.

This does not, however, end the procedural due process ripeness inquiry. Although plaintiffs were not required to pursue a BSA appeal, the Court must nevertheless find plaintiffs' procedural due process claim to be premature. As discussed in Sections A.2. and B, *supra,* plaintiffs' substantive due process and "taking" claims are unripe because plaintiffs never obtained a final determination from the DOB regarding their alteration permit. Without such a determination, the revocation of plaintiffs' permit, which is the basis for plaintiffs' procedural due process claim just as it is the basis for their substantive due process and "taking" claims, was never a sufficiently *final* act to render those claims ripe for adjudication. *See Unity Ventures v. Lake County,* 841 F.2d 770, 776 (7th Cir.1988) ("[b]ecause neither the Village nor the County has made a final decision regarding ... [plaintiff's] property, the plaintiffs' procedural due process claim is not ripe."). *See also, Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1456 (9th Cir.1987).

The ripeness doctrine is designed, in part, "to protect [administrative] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). Plaintiffs' permit was revoked because they did not, as required by law, obtain a certificate of no harassment. Plaintiffs never sought, and therefore were never denied, such a certificate. Plaintiffs conceivably could have obtained a new alteration permit merely by applying for a certificate of no harassment and then reapplying for an alteration permit after obtaining the certificate. Consequently, the DOB never made a sufficiently final decision regarding

plaintiffs' alteration permit to render their procedural due process claim ripe for adjudication.

### 2. Merits of The Procedural Due Process Claim

■ Moreover, plaintiffs' procedural due process claim would fail even were it not premature. Defendants concede that plaintiffs were not provided with notice or an opportunity to be heard prior to the revocation of their permit.[13] Nevertheless, they contend that plaintiffs' due process rights were not violated since plaintiffs would have been granted a stay of the revocation under former § 669(c) had they appealed to the BSA, unless the DOB certified that a stay would endanger life or property. They cite *Porter v. Investors Syndicate,* 286 U.S. 461, 52 S.Ct. 617, 76 L.Ed. 1226 (1932), where the Supreme Court held that when, as part of the administrative review process, "the state statute provides that the complaining party may have a stay until final decision, there is no deprivation of due process," even where the words of the statute attribute "final and binding character to the initial decision ..." *Id.* at 470–471, 52 S.Ct. at 620–621. *See also, Harper v. Lindsay,* 616 F.2d 849, 858 (5th Cir.1980).

In response, plaintiffs rely on a New York Supreme Court decision which found the BSA's post-deprivation procedures unconstitutional, *Tafnet Realty Corp. v. New York City Department of Buildings,* 116 Misc.2d 609, 455 N.Y.S.2d 341 (Sup.Ct., N.Y.Co.1982), *motion for reargument denied, sub nom. Tafnet Realty Corp. v. City of New York,* 118 Misc.2d 498, 460 N.Y.S.2d 729 (Sup.Ct., N.Y.Co.1983).[14] *Tafnet,* like the present case, involved revocation of an alteration permit, and the court there held that the petitioner was denied procedural due process by the DOB's permit revocation procedures. The court determined that a petitioner in an administrative appeal subsequent to a permit revocation was effectively denied the opportunity of a meaningful hearing because he or she was not permitted to present evidence to the BSA in opposition to the revocation:

> ... in adjudicating building permit appeals the B.S.A. can only consider "all the papers ... upon which the action appealed from was taken." N.Y.C. Charter Sec. 669(b). The Board of Standards and Appeals is not authorized to hold an evidentiary hearing in building appeals as it is in zoning appeals. Because a permit appellant cannot enlarge the record before the B.S.A., if there is no record made below, there is effectively no basis for appeal.

116 Misc.2d at 612–613, 455 N.Y.S.2d 341.

This Court agrees that an appeal procedure which did not allow the appellants to present any evidence on their behalf would violate due process. However, it disagrees with the *Tafnet* court's finding that the procedures for appealing permit revocations are so limited. Charter § 669(b) does not, as the *Tafnet* court held, restrict the BSA's review to the record upon which the DOB made its revocation decision. It merely provides that: "[t]he officer from whom the appeal is taken shall ... transmit to [the BSA] all the papers constituting the record upon which the action appealed from was taken." It seems clear to this Court that the purpose of § 669(b) is sim-

---

13. Effective March 1, 1983, the DOB instituted a formalized practice of giving written notice to a permittee of the DOB's intent to revoke a permit *prior* to such revocation, except in certain enumerated situations. Although the general practice before the adoption of this procedure had been to provide such notice, there was no formal policy to this effect, and, as evidenced by the facts of this case, pre-deprivation notice was not provided in all instances.

The pre-deprivation notice policy was subsequently codified by Local Law No. 11 of 1988, amending § 27–197 of the Administrative Code of the City of New York.

14. To the extent the *Tafnet* decision rested upon a resolution of constitutional issues, it is, of course, not binding upon this Court. *Industrial Consultants, Inc. v. H.S. Equities, Inc.,* 646 F.2d 746, 749 (2d Cir.1981), *cert. denied,* 454 U.S. 838, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981); *Jones v. Henderson,* 580 F.Supp. 273, 278 (E.D.N.Y.1984), *aff'd in part, vacated in part,* 809 F.2d 946 (2d Cir.1987). Nor is the *Tafnet* court's interpretation of City regulations strictly binding upon a federal court. *See, e.g., O'Connor v. Lee–Hy Paving Corp.,* 579 F.2d 194, 204–205 n. 15 (2d Cir.1978), *cert. denied,* 439 U.S. 1034, 99 S.Ct. 638, 58 L.Ed.2d 696 (1978).

ply to insure that the BSA has before it an up-to-date record of the proceeding when it hears the appeal. In fact, the *Tafnet* court cited no evidence, nor has this Court been able to discern any, supporting its claim that "[t]he Board of Standards and Appeals is not authorized to hold an evidentiary hearing in building appeals as it is in zoning appeals." *Id.* 116 Misc.2d at 613, 455 N.Y.S.2d 341.

As defendants have pointed out, Article VI, § 4 of the BSA Rules of Procedure provides that the BSA "shall determine what plans and exhibits are required to be filed" for administrative appeals involving interpretation of the Zoning Resolution. An appeal of the revocation of the present plaintiffs' permit, a revocation based upon § 96–109 of the Zoning Resolution, would clearly have fallen into this category. Since the BSA was authorized to *require* the parties to submit additional documents for the appeal, it obviously was not limited to a review of the record before the DOB. Furthermore, Article IV, § 4 of the BSA Rules of Procedure authorizes the BSA to rehear appeals upon the submission of "substantial new evidence that was not available at the time of the initial hearing ..." This provision is patently inconsistent with the notion that the BSA would only have been able to consider the record upon which the DOB had based its decision.

In sharp contrast to administrative appeals *to* the BSA, appeals *from* the BSA's denials of variance and special permit applications to the New York City Board of Estimate are "limited to an administrative determination as to whether the decision of the [BSA] under each of the specific requirements of the zoning resolution was supported by substantial evidence before the [BSA]." Charter § 668(c). *See also, Cotroneo v. Klein*, 62 A.D.2d 493, 495, 405 N.Y.S.2d 483, 484 (2d Dep't 1978) (scope of review by Board of Estimate is "quite narrow"). The absence of any similar restriction with regard to administrative appeals to the BSA further supports the conclusion that none exists.

Finally, defendants have represented that "there has never been any restriction on the presentation of evidence to the BSA during administrative appeal proceedings," and that such procedure in the case of a permit revocation "necessarily involves a *de novo* review by the BSA of the relevant facts and circumstances surrounding the revocation, so that the BSA can use its expertise to determine whether DOB's revocation reflected a correct application of the building and/or zoning laws in question." Defendants' Reply Memorandum of Law in Further Support of Their Cross–Motion for Summary Judgment, at 12, 13 n. 10. Upon careful examination of the relevant provisions, the Court agrees that the appeal procedure for permit revocations entitled plaintiffs to an evidentiary hearing.

For these reasons, the Court does not find *Tafnet* persuasive. The Court finds that, to the extent that the former DOB procedure enabled plaintiffs to stay the revocation of an alteration permit until a hearing had been held, that procedure satisfied due process under *Porter*.

■ Admittedly, the stay authorized by former § 669(c) was not granted in all situations. Plaintiffs would not have been entitled to an automatic stay if the officer responsible for the revocation, upon receiving the notice of appeal, had certified that "a stay would in his opinion cause imminent peril to life or property." In such a case, plaintiffs could only stay enforcement of the revocation by obtaining a restraining order from either the BSA or the New York Supreme Court. This exception, however, does not render the appeal procedure unconstitutional.

It is well established that where there is an emergency or other "exigent" circumstance, a post-deprivation hearing is adequate to satisfy the requirements of due process. *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599–600, 70 S.Ct. 870, 872–873, 94 L.Ed. 1088 (1950); *Patterson v. Coughlin*, 761 F.2d 886, 892 (2d Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986). *See also, RR Village Association, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1204 (2d Cir. 1987). A situation involving imminent peril to life or property would without question

be an "exigent" circumstance, justifying the use of a post-deprivation hearing. *See Ewing, supra,* 339 U.S. at 599–600, 70 S.Ct. at 872–873. Thus, even allowing for the possibility that plaintiffs might have been denied a stay in this case because of a risk of imminent peril to property or life, their procedural due process rights would not have been violated.

As noted above, the revocation of plaintiffs' permit was not a sufficiently final determination to render plaintiffs' procedural due process claim ripe for adjudication. Even if that claim were ripe, however, the former BSA procedures for appealing revocations of alteration permits did not improperly infringe upon plaintiffs' procedural due process rights. The Court consequently grants defendants' motion for summary judgment on that issue.

## II. DOB'S REFUSAL TO ISSUE VACATE OR DEMOLITION ORDERS

■ As noted earlier, plaintiffs have also raised claims concerning the DOB's various decisions not to vacate or demolish their buildings. Plaintiffs allege that these determinations: (i) were arbitrary and capricious, violating plaintiffs' rights to substantive due process; (ii) effected a "taking" of plaintiffs' property without just compensation, and; (iii) denied plaintiffs' equal protection of the laws, since the DOB ordered other buildings in similar or better structural condition to be vacated or demolished.

Defendants have moved for summary judgment as to these claims, while plaintiffs argue that material questions of fact remain to be determined. The Court agrees that the present factual record does not justify a judgment at this stage of the proceedings.

Plaintiffs' constitutional claims regarding the DOB's failure to issue vacate and demolition orders were added relatively recently to this action, appearing for the first time in plaintiffs' third amended complaint. They consequently raise new issues which were not necessarily addressed in plaintiffs' prior discovery. For example, in an order dated October 31, 1986, Magistrate Naomi Reice Buchwald, to whom this case has been referred for pretrial matters, denied plaintiffs' request that defendant Irving E. Minkin answer questions about the demolition issue. The reason for Magistrate Buchwald's ruling was that "plaintiffs have not persuaded us that they seek to inquire about an issue other than the one which may not be relitigated in federal court because of the doctrine of *res judicata.*" Memorandum and Order of Magistrate Buchwald, dated October 31, 1986. This ruling, of course, preceded this Court's order granting plaintiffs leave to amend their complaint to include claims arising from the DOB's failure to issue vacate and demolition *orders,* as opposed to DOB's denial of plaintiffs' requests for demolition *permits.* Because the nature of the claims has now changed, discovery that was previously denied may now be proper.[15]

"Summary judgment should not be granted while the parties opposing judgment seek discovery of potentially favorable information." *Olin Corp. v. Insurance Co. of North America,* 603 F.Supp. 445, 449 (S.D.N.Y.1985), citing *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 10 (2d Cir.1983). And as the Second Circuit has noted, "a denial of access to relevant information weighs in favor of the party opposing a motion for summary judgment." *Burlington Coat Factory Warehouse v. Esprit de Corp.,* 769 F.2d 919, 925 (2d Cir.1985).[16] Since plaintiffs seek, and

**15.** The Court, of course, expresses no opinion on those determinations at this point.

**16.** Defendants argue that there are no contested material facts rendering additional discovery necessary. They contend, for example, that plaintiffs' equal protection claim is wholly based upon the fact that the DOB, in determining when to order that a building be demolished, treats occupied buildings differently than vacant buildings. Since defendants acknowledge such disparate treatment, they argue that summary judgment is appropriate. In the first place, the Court does not necessarily agree that plaintiffs' claim is as limited as defendants suggest. Furthermore, the final manifestation of the equal protection argument, as well as plaintiffs' other claims relating to the DOB's refusal to issue vacate and demolition orders, may be

would arguably be entitled to, additional discovery as to their claims concerning the DOB's refusal to issue vacate and demolition orders, the Court dénies defendants' present motion for summary judgment with regard to these claims.

### CONCLUSION

Defendants' motion for summary judgment as to plaintiffs' substantive due process, procedural due process, and "taking" claims arising from the DOB's revocation of their alteration permit is hereby granted. Defendants' motion for summary judgment as to plaintiffs' substantive due process, "taking," and equal protection claims arising from the DOB's failure to issue vacate and demolition orders for the subject property is denied.

SO ORDERED.

altered as a result of information obtained through additional discovery.