MARATHON OUTDOOR,
LLC, Plaintiff,

v.

Richard C. VESCONTI, Acting Commissioner, Department of Buildings of the City of New York, Rick C. Chandler, Bronx Borough Commissioner, and the City of New York, Defendants.

No. 00CIV.3549(RMB).

United States District Court,
S.D. New York.

July 28, 2000.

Joseph Frost, New York City, for Plaintiff.

Jerald Horowitz, Corporation Counsel of City of New York, New York City, for Defendants.

## ORDER

BERMAN, District Judge.

Plaintiff Marathon Outdoor, LLC ("Plaintiff" or "Marathon Outdoor") commenced this action on or about May 10, 2000 against Richard C. Visconti, Acting Commissioner, Department of Buildings of the City of New York (sued herein as "Richard C. Vesconti"), Rick C. Chandler, Bronx Borough Commissioner, and the City of New York (collectively, "Defendants"), seeking declaratory and injunctive relief and damages in relation to the City's enforcement of § 42–53 and § 43–43 of the New York City Zoning Resolution ("Zoning Ordinance" or "Zoning Resolution") which regulate the construction of outdoor

signs. Plaintiff challenges a May 2, 2000 determination of the New York City Department of Buildings ("DOB") to rescind certain permits previously granted to Plaintiff for the construction of a billboard/sign structure at 1542 Boone Avenue in the Bronx. DOB allegedly rescinded the permits because it determined (1) that the structure was being used for off-site advertising, in violation of § 42–53, and (2) that the structure did not comply with the height and setback requirements of § 43–43.[1] Plaintiff claims that if it is required to remove the sign(s) it has erected, its First Amendment rights to free expression will have been impermissibly restricted. (Complaint ¶ 3). Plaintiff challenges § 42–53 and § 43–43 of the Zoning Ordinance on (U.S.Constitutional) First Amendment and Fourteenth Amendment grounds, and also claims that these provisions, as applied to Plaintiff, result in a denial of equal protection in violation of the Fourteenth Amendment and a taking, in violation of the Fifth Amendment.

On June 16, 2000, Defendants submitted their opposition papers to Plaintiff's motion for a preliminary injunction. Oral argument was held on July 5, 2000. **For the reasons set forth below, Plaintiff's motion for a preliminary injunction is denied.**

## I. *Background*

Plaintiff Marathon Outdoor is a New York corporation engaged in the business of leasing property and erecting "pole signs" (billboards) for advertising purposes. In June 1999, DOB approved applications and issued permits to Plaintiff for the construction of a V-shaped billboard structure along the Sheridan Expressway in the Bronx.[2] Plaintiff submitted separate applications for each of the two signs it planned to erect on opposite sides of the billboard, and a third application for the ground structure on which the signs would be erected and displayed. Plaintiff's applications [numbers 200447169 and 200447187] requested permission to install two signs, one on each side of a single structure at the premises. The applications stated that the signs would be located "within 200 feet of an arterial highway;" that they would be "accessory business signs" which would read, "Imperial Iron Works Corp." and that the cost of completion for each sign would be $3,600. (Chandler Aff. Exs. A, B). DOB approved application 200447187 on June 2, 1999 and application 200447169 on June 4, 1999. Plaintiff's third application [number 200447178] covered the ground structure for the two signs. Application 200447178 stated that the ground structure would be located within 200 feet of an arterial highway; that it would be used for an "accessory business sign," and that it would be completed at a cost of $50,000. (*Id.* Ex. C). DOB approved this application on June 4, 1999. In addition to the applications, Plaintiff also submitted a letter to DOB on May 25, 2000 explaining the accessory use, i.e. that "Imperial Iron Works has been in operation at this location since 1982." (*Id.* Ex. A).

After the applications were approved, Plaintiff entered a ten year lease under which it is obligated to pay $24,000 per year for the property on which it planned to erect its billboard structure. (Compl.¶¶ 7, 12). Plaintiff subsequently

---

**1.** On June 7, 2000, this Court directed the parties to maintain the status quo until the instant motion had been resolved. In response to questions raised by Defendants' counsel at oral argument on July 5, 2000, Plaintiff acknowledged, by letter dated July 7, 2000, that it had, in fact, altered the status quo and placed a Volkswagon advertisement on one side of the billboard contrary to the Court's directive. (Frost letter 7/7/00).

**2.** DOB's Operations Policy and Procedure Notice ("OPPN") # 1/97 states that, "[n]o permit shall be issued for a new or altered ground structure unless there is an approved sign application for the particular location on the zoning lot." (OPPN # ½7, Sec. II, No. 2). Additionally, "[t]he sign application shall note whether it is for a business sign or an advertising sign..." (*Id.* at Sec. II, No. 2).

completed construction of the billboard.[3] The completed billboard contains two separate advertising signs on each side of the V-shaped structure which combined, occupy 2,400 square feet. (Def.'s Opp'n Papers at 5).[4]

On March 27, 2000, DOB notified Plaintiff by letter that "[t]he approval and permits for the referenced premises will be revoked in ten (10) days pursuant to Section 27–197 of the Administrative Code unless additional facts or evidence is submitted to this office to prove there is conformance to all laws." (Chandler Aff. Ex. E). DOB explained that "[t]he approval and permits will be revoked on the basis that the proposed sign is contrary to Section 43–43 of the NYC Zoning Resolution. The proposed sign pierces the Sky Exposure Plane."[5] (Id.).

In its March 27, 2000 letter, DOB also requested proof from Plaintiff within the same ten day period that the billboard was in compliance with § 42–53, in that it was "incidental" to a principal use on the zon-

ing lot.[6] According to the Defendants, DOB believed that the signs were either unrelated to the principal use of the zoning lot in violation of § 42–53, or that the principal use of the lot was unauthorized by local zoning laws. (Chandler Aff. ¶ 7–8). Plaintiff's counsel responded to DOB by letter dated April 4, 2000, stating that, "[s]uch conduct on the part of the Buildings Department is in clear violation of the constitutional rights of my client and should you revoke the permit as threatened, I will be compelled to bring a 1983 action in Federal Court." (Id. Ex. F). **Plaintiff did not, however, submit any evidence to DOB of compliance with either § 43–43 or § 42–53 within the ten day period specified in the March 27, 2000 letter.** On May 2, 2000, DOB revoked the permits and issued a stop-work order, prohibiting any further work on the site. Plaintiff then filed this complaint.

Following the filing of the instant complaint, DOB sent another letter to Plaintiff, dated May 16, 2000, requesting: (1) a survey of the property showing the distance

3. Although the applications indicated that the cost of erecting both signs and the ground structure would total $122,000, Plaintiff now claims that it expended $300,000 on construction. (Compl.¶ 7).

4. As is indicated below, both signs on the billboard originally displayed advertisements for Imperial Iron Works. Subsequent to this Court's direction to the parties to maintain the status quo, Plaintiff changed one of the two signs, which now advertises the Volkswagon Cabrio.

5. In his affidavit, Defendant Rick D. Chandler states, "[a]lthough the March 27, 2000 letter correctly cited ZR § 43–43, it incorrectly stated that the sign pierced the sky exposure plane. (Rather, the sign and structure [allegedly]violated the height and setback requirement of ZR § 43–43 as subsequently explained to Marathon Outdoor and its counsel in a meeting and by letter)." (Chandler Aff. ¶ 8).

Section 43–43 regulates the maximum height and required front setbacks for buildings and other structures, such as signs. Section 43–43 states, "[i]n all districts, as indicated, if the front wall or any other portion of a *building* or *other structure* is located at the

street line or within the *initial setback distance* . . . the height of such front wall or other portion of a *building* or *other structure* . . . shall not exceed the maximum height above the *curb level* as set forth in [an accompanying] table." (ZR § 43–43).

6. Section 42–53 prohibits any off-site commercial advertising signs within 200 feet of an arterial highway. It states, "[i]n all districts, as indicated, no *advertising sign* shall be located, nor shall any existing *advertising sign* be structurally altered, relocated, or reconstructed within 200 feet of an arterial highway. . . if such *advertising sign* is within view of such arterial highway. . . . For the purposes of this Section, arterial highways shall include all highways that are shown on the Master Plan of Arterial Highways and Major Streets, as 'principal routes,' 'parkways' or 'toll crossings' and have been designated by the City Planning Commission as arterial highways to which the provisions of this Section shall apply." (ZR § 42–53). Section 12–10 provides that, "[a]n 'advertising sign' is a *sign* that directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered elsewhere than upon the same *zoning lot* and is not *accessory* to the *use* located on the *zoning lot.*" (ZR § 12–10).

from the property line to the sign pole; (2) documentation showing compliance with DOB's Operation Policy and Procedure Notice # 1/97, which requires proof that the business advertised on a sign is the same business located on the premises if such a sign is located within 200 feet of an arterial highway; and (3) a copy of the certificate of occupancy for the premises. (*Id.* Ex. H). On May 31, 2000 DOB received from Plaintiff a survey of the property, dated May 23, 2000, and a copy of Certificate of Occupancy Number 42891, which had been issued on October 4, 1967 and showed the property to be authorized for use as a parking lot. (*Id.* Ex. I). On June 2, 2000, DOB responded to Plaintiff's submissions, stating that based upon the survey, the sign structure appeared to be over thirty feet high and within fifteen feet of the street line, in violation of § 43–43. (*Id.* Ex. J). The letter further stated that, "[c]onsequently, either the sign, including the entire structure, must be moved so that it is not within 15 feet of the street line or the height must be reduced to less than 30 feet." (*Id.*).

At oral argument on July 5, 2000, Plaintiff's counsel stated (incorrectly): "we built the sign, but there's no copy on it, as I understand." (Rec. at 21). Defendant submitted a letter to the Court on July 6, 2000 stating that "based on a DOB inspection on June 30, 2000, an advertising sign is now being displayed on the premises that reads 'The Cabrio. Drivers Wanted,' with the Volkswagon trademark." (Horowitz letter 6/30/00 at 2). Defense counsel also submitted five photographs of the sign structure to the Court, one of which shows the second sign reading "Imperial Iron Works Corp." and displaying a phone number and address. (DOB Special Report at 2). In a letter dated July 7, 2000, Plaintiff confirmed Defense counsel's allegations that Plaintiff had "violated" this Court's order to maintain the status quo until the instant motion had been resolved. The letter admits that, "[a]s appears from the photographs submitted by Mr. Horowitz, ... the billboard does in fact advertise the business at the location. The obverse side of the sign does advertise Volkswagon...." (Frost letter 7/7/00 at 3). Plaintiff's counsel volunteered to remove the Volkswagon sign, however, stating at oral argument, "I don't think my client understood what the Court said, that the status quo remains. So I'll direct him to take it down." (Rec. at 53).

Plaintiff argues generally that § 43–43, through its height and setback requirements, places impermissible restrictions on free speech and that "[h]undreds of pole signs near arterial highways have been constructed throughout the City of New York over many years and never before the latter part of 1999 has this section applied to pole signs." (Pl.'s Reply Mem. at 9). Plaintiff also contends that § 43–43 unfairly discriminates between various outdoor structures, e.g. by exempting flagpoles, chimneys, steeples and towers. (Pl.'s Mem. at 5). As to § 42–53, Plaintiff argues that this Section results in differential treatment of types of speech based on content, e.g. "a similar pole sign is permitted for political or charitable purposes." (*Id.* at 4). As noted, Plaintiff also contends that enforcement of both § 43–43 and § 42–53 against it constitutes a denial of equal protection and a taking in violation of the Fifth Amendment.

Defendants respond that the Zoning Resolution was amended in response to a New York State Supreme Court ruling in *City of New York v. Allied Outdoor Advertising*, 172 Misc.2d 707, 659 N.Y.S.2d 390 (Sup.Ct. Kings Co.1997), in which the Court held that § 42–53 "unconstitutionally favors onsite commercial advertising over noncommercial messages and permits certain categories of noncommercial messages while barring others." *Id.* at 395. Defendants state that, "[o]n April 8, 1998, the Zoning Resolution was (substantially) amended as to sign regulation, to eliminate *inter alia,* any preference for commercial over non-commercial speech." (Def.'s Opp'n Papers at 1). Defendants claim

that, although the Zoning Resolution restricts the time, place, and manner of commercial speech, such restrictions are lawful means of promoting the public investment in arterial highways, safe public travel, and natural beauty. (*Id.* at 2–3). Defendants also contend that because Plaintiff has not applied to the New York City Board of Standards and Appeals ("BSA") for a variance or a waiver, Marathon has not exhausted its administrative remedies, and its as-applied equal protection and taking claims are thus, not ripe for adjudication.

By letter dated July 7, 2000, Plaintiff's counsel informed the Court, "my client would be willing to angle the billboard so that it would meet the 20 foot requirement under ZR 43–43" (Frost letter 7/7/00 at 2) and that "early next week an application will be made to change the group [on the Certificate of Occupancy] from Parking Lot Group 7 to the appropriate Group for a Metal Storage Yard." (*Id.*). In addition, Plaintiff's counsel stated that, if the Court so ordered, he would direct Marathon to remove the Volkswagon advertisement.[7] (Rec. at 53). Defense counsel responded by letter dated, July 11, 2000, that Plaintiff has misinterpreted § 43–43 and that angling the sign would change nothing because "if the structure does not comply with the minimum setback distances in Section 43–43 (as in the instant case), then the structure can not exceed a maximum height of 30 feet." (Horowitz letter 7/11/00 at 1). Defense counsel also argues in the July 11, 2000 letter that Plaintiff is incorrect in its assumption that changing a Certificate of Occupancy is "pro forma." ("The application for a change of use re-

quires a thorough examination of the Building Code and Zoning Resolution, which may require further action by the plaintiff before such an application may be approved by DOB." (*Id.* at 2)).[8] Plaintiff maintains that "the heart of the issue raised in this litigation [is] whether the prohibition of commercial advertising within 200 feet of an arterial highway is an unconstitutional infringement on the plaintiff's right of free speech." (Frost letter 7/7/00 at 3).

## II. *Standard of Review*

■ "A preliminary injunction 'is an extraordinary and drastic remedy which should not be routinely granted.'" *Sapienza v. New York News, Inc.,* 481 F.Supp. 671, 674 (S.D.N.Y.1979) (quoting *Medical Society of the State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977)). In addition, "[a]n injunction is an equitable remedy issued under established principles which guide courts of equity." *Sierra Club v. United States Army Corps. of Engineers,* 732 F.2d 253, 255 (2d Cir.1984).[9] "To obtain a preliminary injunction, a plaintiff must show (1) irreparable harm and (2) either (a) that it is likely to succeed on the merits or (b) sufficiently serious questions regarding the merits of the claim to make them fairly litigable, with the balance of hardships tipping decidedly in the plaintiff's favor." *Fun–Damental Too, Ltd. v. Gemmy Industries Corp.,* 111 F.3d 993, 998–99 (2d Cir.1997). *See also Ecolab, Inc. v. K.P. Laundry Machinery, Inc.,* 656 F.Supp., 894, 899 (S.D.N.Y.1987). Where, as here, the moving party seeks to stay governmental action purportedly tak-

---

7. Defense counsel argues that because Plaintiff failed to maintain the status quo, as the Court had previously directed. Plaintiff "ha[s] not shown clean hands so as to warrant the injunctive relief requested." (Horowitz letter 7/6/00).

8. Defense counsel clearly stated at oral argument, however, that changing the Certificate of Occupancy is a "ministerial matter." (Rec. at 35).

9. Even if a plaintiff demonstrates both irreparable injury and a likelihood of success on the merits, "[a] court may deny injunctive relief based on the defense of unclean hands 'where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue...'" *Estate of John Lennon v. Screen Creations, Ltd.,* 939 F.Supp. 287, 293 (S.D.N.Y.1996) (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1383 (6th Cir.1995)) (citations omitted).

en in the public interest pursuant to a regulatory scheme, "the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989) (citing *Union Carbide Agricultural Products, Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir.1980)).

## III. *Discussion*

### A. Irreparable Injury

 Plaintiff alleges both money damages and violations of its First, Fifth, and Fourteenth Amendment rights. "[C]ourts should avoid issuing preliminary injunctions in cases where money damages would be adequate compensation." *Lentjes Bischoff v. Joy Environmental Technologies, Inc.*, 986 F.Supp. 183, 185 (S.D.N.Y.1997). However, an allegation that First Amendment rights have been violated is generally sufficient to satisfy the irreparable injury prong of the preliminary injunction test. *Bery v. City of New York*, 97 F.3d 689 (2nd Cir.1996). In *Bery*, where artists sought an injunction against the enforcement of an ordinance that prohibited selling artwork in public spaces without a license, the Court explained that "[v]iolations of First Amendment rights are commonly considered irreparable injury for the purposes of a preliminary injunction." *Id.* 693. Similarly, where a magazine sought an injunction against the City transit authority for refusing to display the magazine's advertisements on its buses, the Court stated "[t]he 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *New York Magazine, a Division of Primedia Magazines, Inc. v. Metropolitan Transp. Auth.*, 136 F.3d 123, 128 (2d Cir.1998) (quoting *Deeper Life Christian Fellowship Inc. v. Board of Educ.*, 852 F.2d 676, 679 (2d. Cir.1988)) (citations omitted). By virtue of Plaintiff's

allegations that § 43–43 and § 42–53 impermissibly restrict Plaintiff's First Amendment rights, the first prong of the test is satisfied. *Bery*, 97 F.3d at 693.

### B. Likelihood of Success on the Merits

As Plaintiff has alleged constitutional harm sufficient to satisfy the "irreparable injury" criterion, the (sole) remaining question is whether Plaintiff has established likelihood of success on the merits of its claims. *See Plaza Health Laboratories*, 878 F.2d at 580 (2d Cir.1989); *Tri–State Video Corporation v. Town of Stephentown*, 1998 WL 72331 *5 (N.D.N.Y. Feb.13, 1998). The Court thinks not, in the context of an injunction (without, however, ruling upon the ultimate merits of Plaintiff's case).

### (i) Ripeness

 A threshold issue is the ripeness of Marathon's "as applied" equal protection and takings claims. Plaintiff claims that enforcement of § 43–43 against it is a denial of equal protection because this Section was allegedly reinterpreted to apply to billboards in November 1999 and "for years permits were issued without a setback." (Pl.'s Mem. Law at 5). Plaintiff also contends that revocation of its permits is a taking in violation of the Fifth Amendment. Defendants argue that the Court should not entertain these claims because Plaintiff has not exhausted its administrative remedies. Specifically, Defendants claim that since Plaintiff has not applied to the BSA for a variance or a waiver, it may not (yet) bring these claims to Federal court.

 The U.S. Supreme Court has addressed the issue of ripeness in *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), and explained that in cases challenging the application of local land use controls, the government entity charged with implementing the reg-

ulations must have "reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186, 105 S.Ct. 3108. Similarly, courts in this District have held that "application for a variance is generally the procedural predicate for the final decision upon which the ripeness inquiry rests." *Rivervale Realty Co., Inc. v. Town of Orangetown,* 816 F.Supp. 937, 942 (S.D.N.Y.1993). A party generally must turn to "the normal local and state procedures for resolving zoning issues before anticipatory relief can be involved, else the operations of local government would be paralyzed." *Id.* at 943.

Plaintiff here has not exhausted its administrative remedies and thus, the "final decision" requirement is not satisfied. Plaintiff failed adequately to address the objections DOB raised in its March 27, 2000 letter and also failed to seek administrative review, e.g. a determination from BSA regarding a variance or waiver. "The BSA, comprised of five experts in land use and planning, is the ultimate administrative authority charged with enforcing the Zoning Resolution." *Toys "R" Us v. Silva,* 89 N.Y.2d 411, 419, 654 N.Y.S.2d 100, 676 N.E.2d 862 (1996); *see also* New York City Charter § 666.5. "The City Charter allows a permitee to appeal the revocation of a ... permit to the New York City Board of Standards and Appeals, an administrative agency authorized to hear such appeals." *Weissman v. Fruchtman,* 700 F.Supp. 746, 748 (S.D.N.Y.1988). Plaintiff here has made no such appeal to BSA.[10]

In *Weissman,* where landowners challenged DOB's revocation of their building permits, U.S. District Court Judge Peter K. Leisure held that Plaintiffs' takings claim was not ripe. Since the Plaintiffs had not applied to BSA, "they never obtained a final decision regarding their application permit and their 'taking' claim never matured." *Id.* at 755. Likewise, in *Parkview Associates v. City of New York,* 71 N.Y.2d 274, 525 N.Y.S.2d 176, 519 N.E.2d 1372 (N.Y.1988), where a building permit was issued in error and revoked after substantial work had been completed, the New York State Court of Appeals rejected Plaintiff's taking claim because the Plaintiff had not applied to BSA for variance. *Id.* at 283, 525 N.Y.S.2d 176, 519 N.E.2d 1372. ("Parkview's claim that the City's action constitutes a taking without due process of law or just compensation may not be addressed in this action and at this time because Parkview has failed to apply for a variance."). Since Plaintiff has not availed itself the available administrative remedies, it may not at this time assert as applied Fourteenth and Fifth Amendment claims in Federal court. *Weissman,* 700 F.Supp. at 755.

■ Even if Plaintiff's equal protection claim were considered ripe for adjudication, it is not clear that it would succeed on the merits. Plaintiff claims that "[i]n or about November 1999, the Buildings Department ... reinterpreted ZR Section 43–43 to include pole signs." (Pl.'s Reply Mem. at 9), and that "[h]undreds of pole signs have been constructed throughout the City of New York over many years and

---

10. In *Gottlieb v. Village of Irvington,* 69 F.Supp.2d 553 (S.D.N.Y.1999), where the Village issued a stop work order after it had erroneously approved a building permit, the Court declined to hear Plaintiff's as applied constitutional claims because the municipality had not reached a final decision regarding Plaintiff's property. The Court stated, "Plaintiffs' strategy was not a wise one. Their constitutional claims are not ripe for adjudication because they have not sought nor received a final decision from the Village as to the ... change they sought." *Id.* at 559. In *Goldfine v. Kelly,* 80 F.Supp.2d 153 (S.D.N.Y.2000), a

landowner asserted equal protection claims against the City of New York for failing to approve an application to subdivide his property. The Court rejected Plaintiff's claims because he had not obtained a final decision from the City agency charged with enforcing such regulations, stating, "in terms of plaintiff's equal protection claims, the court cannot evaluate whether similarly situated landowners were treated differently than plaintiff until it determines how the [City] ... enforced the regulations" *Id.* at 159, as to Plaintiff's property.

never before the latter part of 1999 has this section been applied to pole signs." (*Id.*). The Second Circuit has explained that a violation of equal protection by "selective enforcement" occurs if "(1) the person, compared with others similarly situated, was selectively treated; and (2)... such selective treatment was based on an impermissible consideration such as race, religion, intent to inhibit or punish the exercise of constitutional rights or malicious or bad faith intent to injure a person." *Crowley v. Courville,* 76 F.3d 47, 52 (2d Cir.1996). The Court notes that "a demonstration of different treatment [of] persons similarly situated, without more, would not establish malice or bad faith." *Id.* at 53.

In order to succeed on this claim, Plaintiff would have to establish not only disparate treatment, but also an intent by Defendants to inhibit the exercise of Plaintiff's constitutional rights, or an intent to discriminate based on race, religion, malice or bad faith. *Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York,* 1994 WL 455553 (S.D.N.Y. August 19, 1994) (dismissing selective enforcement claim where plaintiff failed to show disparate treatment was based on race, religion, intent to inhibit exercise of constitutional rights, or malicious intent). In addition, "[c]onclusory allegations that a plaintiff was selectively treated are insufficient." *Contractors Against Unfair Taxation,* 1994 WL 455553 at *6 (citing *Albert v. Carovano,* 851 F.2d 561 (2d Cir.1988)). No such showing is made here.

■ And, similarly, even if Plaintiff's takings claim were considered ripe for adjudication, it is not clear that it would succeed on the merits. Plaintiff has not alleged facts sufficient to sustain a claim of a taking. In *Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999), where the Second Circuit rejected a homeowner's claim of a property interest in the issuance of a building permit, the Court explained that "before a plaintiff attempts to prove that a state official['']s denial of a permit deprived him of a property right in the permit... he must first establish that he had a federally protectable property right in the permit. This requires a demonstration that he had a clear entitlement to the permit under state law." *Natale,* 170 F.3d at 263. *See also Ultimate Custom Cycles, Inc. v. Town of Greenburgh,* 1999 WL 135201 (S.D.N.Y. March 11, 1999) (holding that plaintiffs did not have property interest in a special use permit which was not in compliance with the zoning board's specified standards). Moreover, "[a]n invalidly granted permit 'vests no rights in contravention of a zoning ordinance in the person obtaining that permit.'" *Midas Muffler v. City of Albany,* 186 A.D.2d 856, 587 N.Y.S.2d 811 (N.Y.App. Div.1992) (quoting *Matter of Showers v. Town of Poestenkill Zoning Board of Appeals,* 176 A.D.2d 1157, 575 N.Y.S.2d 600 (N.Y.App.Div.1991)) (citations omitted).

### (ii) First Amendment Claim

■ Plaintiff claims that "[t]he Sign Code restricts freedom of expression by prohibiting placement of advertising signs within 200 feet of an arterial highway while permitting business signs, signs which contain copy regarding governmental, charitable, religious, civic, philanthropic and/or education organizations." (Compl.¶ 6). Plaintiff also argues that the challenged Sections result in "an unconstitutional prior restraint on speech in that it requires approval of the form and content of the sign before a permit would issue." (Compl.¶ 18). Defendants respond that because § 43–43 "regulates the maximum height and required front setbacks for buildings and other structures, its application to sign structures is completely content-neutral and does not infringe on First Amendment protections." (Def.'s Opp'n Papers at 11). In addition, Defendants argue that § 42–53 is valid because (it will result in fewer signs and) "fewer signs along the arterial highways will present fewer distractions," and " § 42–53 directly

advances the government's interests in health, safety, general welfare and aesthetics." (*Id.* at 15).

"The Second Circuit has adopted the (plurality) decision in *Metromedia,[ Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) ] concerning sign regulation." *Knoeffler v. Town of Mamakating,* 87 F.Supp.2d 322, 330 (S.D.N.Y.2000) (citing *National Advertising Co. v. Town of Niagara,* 942 F.2d 145, 147 (2d Cir.1991)). In *Metromedia,*[11] where sign owners sought to enjoin San Diego's enforcement of a billboard ordinance, the Court used a four prong test to assess government restrictions on commercial speech that it had established in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The Court explained,

> (1) [t]he First Amendment protects commercial speech only if that speech concerns lawful activity and is not misleading. A restriction on otherwise protected commercial speech is valid only if it (2) seeks to implement a substantial governmental interest, (3) directly advances that interest, and (4) reaches no further than necessary to accomplish the given objective.

*Metromedia,* 453 U.S. at 507, 101 S.Ct. 2882 (citing *Central Hudson,* 447 U.S. at 563–566, 100 S.Ct. 2343). In *Metromedia,* the Court struck down an ordinance under which "on-site commercial advertising is permitted, but other commercial advertising and noncommercial communications using fixed-structure signs are everywhere forbidden unless permitted by one of the specified exceptions." *Id.* at 494, 101 S.Ct. 2882. The Court held that the ordinance impermissibly preferred commercial speech to non-commercial speech, but insofar as the ordinance regulated commercial speech, it was found to be constitutional. *Id.* at 512, 101 S.Ct. 2882. "[O]ffsite commercial billboards may be prohibited while onsite commercial billboards are permitted." *Id.* ("traffic safety and the appearance of the city—are substantial governmental goals," *id.* at 507–508, 101 S.Ct. 2882, and "the prohibition of off-site advertising is directly related to the [ordinance's] stated objectives." *Id.* at 511, 101 S.Ct. 2882).

Section 42–53 of the present Ordinance, like (that portion of) the ordinance in *Metromedia* which the Supreme Court "found" constitutional, permits on-site advertising but prohibits off-site commercial advertising. Section 42–53 states in pertinent part that "no *advertising sign* shall be located, nor shall any existing *advertising sign* be structurally altered, relocated, or reconstructed within 200 feet of an arterial highway" (ZR § 42–53). An "advertising sign" is defined as "a *sign* that directs attention to a business, profession, commodity, service or entertainment conducted, sold or offered elsewhere than upon the same *zoning lot* and is not *accessory* to

---

**11.** Plaintiff argues that the Court should not rely on *Metromedia* or *Central Hudson* because the Supreme Court has more recently rejected the reasoning of these cases. (Pl.'s Reply Mem. at 1). Plaintiff cites three cases, none of which is controlling here. In *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), which involved distribution of publications on newsracks, the Court explained that *Metromedia* had no application to the disparate treatment of periodicals because of the unique relationship between commercial and noncommercial text in news publications. *Discovery Network* 507 U.S. at 423, 113 S.Ct. 1505. In *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996), Rhode Island was attempting to limit alcohol advertisements to decrease demand for alcohol. The Court stated that the *Central Hudson* test does not apply where "the government's asserted interest is to keep legal users of a product or service ignorant in order to manipulate their choices in the marketplace," *Id.* at 499, 116 S.Ct. 1495. In *Greater New Orleans Broadcasting Ass'n, Inc. v. United States,* 527 U.S. 173, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999), concerning radio advertisements for casinos, the Court stated, "[i]n this case, there is no need to break new ground. Central Hudson, as applied in our more recent commercial speech cases, provides an adequate basis for decision." *Id.* at 184, 119 S.Ct. 1923.

the *use* located on the *zoning lot.*" (ZR § 12–10). An "accessory use" is defined by the Ordinance as "a *use* conducted on the same *zoning lot* as the principal *use* to which it is related...." (*Id.*). The Zoning Resolution also states that all provisions shall be interpreted "to promote public health, safety, and general welfare." (ZR § 11–21).

Applying the *Metromedia* criteria, the Court believes that Plaintiff is not likely to succeed on the merits. The Volkswagon sign is clearly not an accessory use sign under § 12–10. The parties agree that although the other existing sign, i.e. for Imperial Iron Works, is incidental to the principal use on the lot, the current Certificate of Occupancy does not authorize an iron works facility as a use.[12] In *People v. Butt,* 153 Misc.2d 751, 583 N.Y.S.2d 732 (N.Y.Crim.Ct.1991), where the Defendant was charged with arranging his cellar to

be used as a factory, contrary to the Certificate of Occupancy which authorized only a one-family dwelling, the Court explained, "[i]f the observations of the building inspector were established by proof... the Court could conclude that the premises were arranged to be used for an illegal purpose." *Id.* at 736. Since operating a premises which does not conform to the Certificate of Occupancy constitutes illegal activity, advertisements for such activity may not be entitled to First Amendment protection.[13] *Metromedia,* 453 U.S. at 507, 101 S.Ct. 2882; *New York State Ass'n Realtors v. Shaffer,* 27 F.3d 834, 841 (2d Cir.1994) ("in determining whether the... regulation is a valid restriction on commercial speech under the *Central Hudson* test,... we look to see if, at a minimum, the speech at issue 'concerns lawful activity.'") (citations omitted).[14]

---

**12.** The current Certificate of Occupancy [Number 42891], which was issued on October 4, 1967, authorizes the premises to be used only as a parking lot. (Chandler Aff. Ex. I). Parking is not the current use, nor apparently, has it been for some time. Iron works storage facilities are permitted to operate in an M1–1 district, which is where the premises is located. (Chandler Aff. ¶ 17) However, the Certificate of Occupancy has not been changed to reflect the current use of the property in order for the activity at the premises to comply with local zoning laws. *See* OPPN # 1/97

**13.** Because the "Imperial Iron Works" sign does advertise the business operating at the premises, it is not an "offsite advertising sign." (ZR § 42–53). Accordingly, the analysis of the restrictions upon offsite advertising applies (only) as to the Volkswagon sign.

**14.** In addition, as to the ("off-site") Volkswagon sign, " 'laws restricting commercial speech, unlike laws restricting other forms of protected expression, need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny.' " *New York State Ass'n of Realtors,* 27 F.3d at 842 (quoting *Edenfield v. Fane,* 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)). As the Court in *Metromedia* held, it is reasonable for the City to conclude billboards may decrease traffic safety; "[w]e likewise hesitate to disagree with the accumulated, common-sense judgments of

local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety. There is nothing here to suggest that these judgments are unreasonable." *Metromedia,* 453 U.S. at 509, 101 S.Ct. 2882. "Signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue v. Gilleo,* 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

Section 11–21 of the Zoning Resolution states that "[i]n interpreting and applying the provisions of this Resolution, such provisions shall be considered as the minimum requirements (a) to promote public health, safety and general welfare, as set forth in the preamble to this Resolution... and (b) to provide a gradual remedy for existing conditions which are detrimental thereto." (ZR § 11–21). *See National Advertising Co. v. Town of Babylon,* 900 F.2d 551, 555 (2d Cir.) cert. denied, 498 U.S. 852, 111 S.Ct. 146, 112 L.Ed.2d 112 (1990); *Knoeffler,* 87 F.Supp.2d at 322 ("the Town's interest in traffic safety and aesthetics is significant."); *Abel v. Town of Orangetown,* 759 F.Supp. 161, 165 (S.D.N.Y.1991) ("we accept that safety and aesthetics are proper legislative concerns supporting regulation of speech"). Limiting the number of distractions, such as billboards located on major highways is directly related to the promotion of the public safety, and New York City could reasonably have determined that off-site advertising is more distracting than on-site ad-

Plaintiff seeks to rely on *North Olmsted Chamber of Com. v. North Olmsted*, 86 F.Supp.2d 755 (N.D.Ohio 2000) for the proposition that "an almost identical ordinance [to § 42–53] was recently struck down as an unconstitutional infringement on free speech." (Pl.'s Mem. Law at 2). *North Olmsted* is not controlling. The ordinance in *North Olmsted* was invalidated because it "contain[ed] a litany of content-based restrictions on protected noncommercial speech." *North Olmsted*, 86 F.Supp.2d at 769. Section 42–53, conversely, restricts only commercial speech, and does so in accordance with *Metromedia*. The Supreme Court has specifically held that the Constitution "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression," *Central Hudson*, 447 U.S. at 563, 100 S.Ct. 2343, and that "commercial speech could be regulated on grounds that protected noncommercial speech could not." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 433, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). Moreover, the Court in *North Olmsted* expressly states that "the City could ban offsite commercial billboards if it found them to impinge on traffic safety and aesthetics." *Id.* at 772 n12. As § 42–53 restricts only offsite commercial advertising, *North Olmsted* does not bolster Plaintiff's argument.

■ Nor is Plaintiff likely to succeed on the merits of its challenge to § 43–43, which regulates the placement and construction of (all) signs, regardless of their content. Section 43–43 is entirely content-neutral.[15] In *Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334 (S.D.N.Y.1998), where Plaintiffs challenged the City of New York's denial of a parade permit, the Court stated, "a content-neutral regulation may restrict the time, place, and manner of protected speech, provided it is 'narrowly tailored to serve a significant governmental interest' and 'leave[s] open ample alternative channels for communication.'" *Id.* at 345 (citing *Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir.1996) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989))).

Section 43–43 appears to be narrowly tailored and intended as a means of promoting public safety and aesthetics. (ZR § 11–21). *See Metromedia*, 453 U.S. at 509, 101 S.Ct. 2882 and *City of Ladue*, 512 U.S. at 48, 114 S.Ct. 2038 ("regulation of billboards is directly related to these objectives"). Section 43–43 does not foreclose "alternative channels for communication;" it regulates only the (maximum) height and setback requirements for outdoor structures. In *Bery*, the Court of Appeals held that artists were being deprived of ample alternative channels of communication because the ordinance at issue was "a de facto bar preventing visual artists from exhibiting and selling their art in public areas in New York." *Id.* at 697. Similarly, the Supreme Court held in *City of Ladue* that an ordinance which banned displaying signs from one's own residence foreclosed ample alternative channels of communication. In explaining why the ordinance at issue failed, the Court stated, "we are not confronted here with mere regulations short of a ban." *City of Ladue*, 512 U.S. at 58 n. 17, 114 S.Ct. 2038. In the instant case, conversely, signs are not banned entirely, nor are they even prohibited; they are only required by § 43–43 to adhere to certain structural guidelines, in order to promote "the government's interests in health, safety, general welfare and

---

vertising. *See Metromedia*, 453 U.S. at 511, 101 S.Ct. 2882; *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949).

**15.** Section 43–43 regulates the maximum height and required setbacks for "any building or other structure." (ZR § 43–43). "A 'building or other structure' includes any building or any other structure of any kind." (ZR § 12–10). Section 43–43 applies to all signs, regardless of their content, and "courts will apply... a more lenient analysis to content-neutral regulations." *Million Youth March v. Safir*, 18 F.Supp.2d 334, 345 (S.D.N.Y.1998).

aesthetics." (Def.'s Opp'n Papers at 11). Plaintiff does not argue that it is being deprived of alternative channels of communication, but argues only that § 43–43 is unconstitutional "in that it requires approval of the form ... of the sign before a permit would issue." (Compl.¶ 18). In *Knoeffler*, 87 F.Supp.2d 322, where an ordinance restricting lawn signs was challenged on the grounds that it violated the plaintiff's First Amendment rights, the Court stated, "[i]t is common ground that governments may regulate the physical characteristics of signs ..." *Knoeffler*, 87 F.Supp.2d at 325 (quoting *City of Ladue*, 512 U.S. at 48, 114 S.Ct. 2038).

### (iii) Equal Protection Claim

Plaintiff also claims that § 42–53 "violates the Equal Protection Clause of the Fourteenth Amendment in that it permits pole signs for favored speech as opposed to commercial speech." (Pl.'s Mem. Law at 4). Similarly, Plaintiff claims that "ZR 43–43 exempts chimneys, roof water tanks, cooling towers, flag poles, church towers, spires and belfries" and that "the prohibition of pole signs is an arbitrary distinction which does not materially affect the purpose of ZR 43–43." (*Id.* at 9). Defendants respond, in reference to § 42–53, that "plaintiff's inartfully pleaded second claim on equal protection grounds is necessarily subsumed within the First Amendment analysis." (Def's Reply Papers at 4). Defendants also contend that "Plaintiff's argument regarding the rationality of the Zoning Resolution's exemption of set back requirements [in § 43–43] for obstructions such as flagpoles, chimneys and towers does not raise a valid equal protection claim." (*Id.* at 20).

The Court believes "[t]he Equal Protection Clause ... 'is essentially a direction that all persons similarly situated should be treated alike.'" *Ultimate Custom Cycles*, 1999 WL 135201 at *6 (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Where a challenged ordinance limits the location of commercial signs, "the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests." *Carey v. Brown*, 447 U.S. 455, 461–62, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). In *Gasparo v. City of New York*, 16 F.Supp.2d 198 (E.D.N.Y.1998), where news vendors sought an injunction against New York City's implementation of a(new) concession scheme which provided that future newsstand concessions would be distributed through competitive bidding procedures, the Court stated, "[b]ecause the First Amendment test also imposes a requirement that there be 'ample alternative channels of communication' open to speakers, the First Amendment analysis is more stringent than the Equal Protection analysis." *Id.* at 222. Generally, an "ordinance that can withstand scrutiny under the First Amendment is not vulnerable to an Equal Protection challenge." *Id.* at 223. This is true here as both § 42–53 and § 43–43 are likely to withstand scrutiny on the merits. *Id.* at 222.

Section 42–53 appears to be tailored to support governmental interests in public safety and general welfare. *See Metromedia*, 453 U.S. at 507–508, 512, 101 S.Ct. 2882 ("traffic safety and the appearance of the city—are substantial governmental goals," and "the prohibition of off-site advertising is directly related to the [ordinance's] stated objectives."). And, the guidelines under § 42–53 do not on their face appear more restrictive than necessary. *Id.* at 508, 101 S.Ct. 2882 (if the city believes "billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them."); *see also Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (complete ban on posting signs on public property curtailed no more speech than necessary to advance city's interests in aesthetics and safety). The validity of § 42–53 is not di-

minished because it "permits favored speech as opposed to [off-site] commercial speech." (Pl.'s Mem. Law at 4). "The city has decided that in a limited instance— onsite commercial advertising—its interests should yield. We do not reject that judgment." *Metromedia*, 453 U.S. at 512, 101 S.Ct. 2882. Permitting on-site advertising, while prohibiting off-site advertising is not impermissible. *See id.* at 513, 101 S.Ct. 2882. In *City of New York v. Allied Outdoor Advertising*, 172 Misc.2d 707, 659 N.Y.S.2d 390 (Sup.Ct. Kings Co.1997), where the City was directed by the Court to amend § 42–53 so as to eliminate any preference for commercial over non-commercial speech, the Court stated, "[i]t is beyond dispute that, in the exercise of its police power, the City may regulate commercial speech, and, indeed prefer one type of commercial speech over another." *Id.* at 397.

As to § 43–43, which applies equally to all signs regardless of their content, Plaintiff contends that by "exempt[ing] flagpoles, steeples, chimneys and towers," this Section makes an "illogical distinction." (Pl.'s Mem. Law at 5). In *Buzzetti v. City of New York*, 140 F.3d 134 (2d Cir.1998), although factually distinguishable from this case, the Second Circuit confronted an analogous situation. There, the owner of an adult entertainment establishment challenged an ordinance on equal protection grounds because it contained maximum upper-body exposure limits which were applied differently to female dancers than to male dancers. The Court rejected Plaintiff's challenge, explaining that the Equal Protection Clause does not require "things which are different in fact . . . to be treated in law as though they were the same." *Id.* at 141 (quoting *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 469, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981)). Moreover, structures such as flagpoles and chimneys are also restricted by the Zoning Resolution. Section 43–42 delineates the maximum height and size of each of the referenced structures. (ZR § 43–42). "The legislature may make classifications * * * without infringement of the equal protection guarantee, and its discretion in this regard is broad and will not be disturbed." *Greenburgh No. 11 Federation of Teachers, Local 1532, Amer. Federation of Teachers, AFL–CIO v. Helsby*, 41 A.D.2d 329, 342 N.Y.S.2d 588 (1973).

## IV. *Future Proceedings and Discovery*

While the Court has determined for purposes of the instant injunction motion (only) that Plaintiff is not likely to succeed on the merits of its claims, this does not mean, and the Court does not mean to suggest, that there is no validity to allegations in the complaint. For instance, although the Certificate of Occupancy authorizes the premises to be used only as a parking lot (Chandler Aff. Ex. I), Plaintiff did notify DOB on May 25, 1999 (prior to approval of the permit applications) that "Imperial Iron Works has been in operation at this location since 1982." (*Id.* Ex. A). And, contrary to the position most recently asserted by the City, Defense counsel clearly stated at oral argument on July 5, 2000 that amending a Certificate of Occupancy to reflect the current use is "a ministerial matter." (Rec. at 53). (In his letter dated July 11, 2000, defense counsel wrote, "plaintiff is incorrect when it states that the application for a change of use is pro forma." (Horowitz letter 7/11/00)). The mode of enforcement may also be a concern raised by these proceedings. Defense counsel stated at oral argument that City officials at DOB met in February 2000 "and at that meeting, they had made a decision to enforce § 43–43 as to billboards" for the first time. (Rec. at 46). The Court notes that Plaintiff's permits were issued in June 1999, and that the permits were revoked on May 2, 2000, barely a year after they had been issued. The fairness (or lack thereof) of DOB's actions toward Plaintiff may be an issue, as may be the fairness with which Plaintiff's subsequent administrative appeals, if any, are treated.

These matters are best determined through discovery. Actions and decisions of a zoning board "may be interfered with... when the Board has clearly acted 'solely upon grounds which as a matter of law may not control its discretion.'" *Syracuse Land Corp. v. Town of Clay*, 112 A.D.2d 51, 490 N.Y.S.2d 663, 664 (N.Y.App.Div.1985). While a zoning board's decision "may not be set aside in the absence of illegality, arbitrariness or abuse of discretion," *Collins v. Carusone*, 126 A.D.2d 847, 510 N.Y.S.2d 917, 919 (N.Y.App.Div.1987), a zoning board's determination is "not entitled to unquestioning judicial deference." *Tallini v. Rose*, 208 A.D.2d 546, 617 N.Y.S.2d 34, 35 (N.Y.App.Div.1994) (citations omitted). And where it has acted in a manner that "is irrational or unreasonable, a zoning board's determination will be annulled." *Id.*

## V. *Conclusion*

For the foregoing reasons, the Court denies Plaintiff's request for a preliminary injunction.